GREELEY-BURNHAM GROCER COMPANY ET AL., Respondents, v. GEORGE W. CAPEN, Appellant.

**St. Louis Court of Appeals, November 9, 1886.**

1. AGENCY—CONTRACT.—A contract having been made by an agent who had full authority to make it on behalf of his principal, is not affected by the agent's inaccurate report of its terms to his principal.

2. —— EVIDENCE—PRESUMPTIONS—PRACTICE.—If, upon a reasonable construction of the correspondence and course of dealing between an alleged agent and his principal, the agent's authority is presumable as a fact, the trial court will not declare as a matter of law that the agent had no authority.

3. STATUTE OF FRAUDS—SUFFICIENT MEMORANDA.—"Sold notes" constitute sufficient memoranda under the statute of frauds, although they omit to state the time of delivery of the goods sold.

4. —— Under the statute of frauds, the contract need not be in one writing, but it may be established by the letter correspondence between the parties.

APPEAL from the St. Louis Circuit Court, AMOS M. THAYER, Judge.

*Affirmed.*

R. M. NICHOLS, for the appellant: The evidence discloses that S. B. Pike & Co. were only factors of George W. Capen, and as such he had no authority to sell goods for the account of his principal which had not been consigned to him. Wharton on Agency and Agents, sect. 735; Story on Agency, sect. 28, and note 165 [8 Ed.] 1 Benjamin on Sales, sect. 244; Edwards on Factors and Brokers, sects. 1 and 97. There was no contract, under the statute of frauds. *Steinberg v. Kintzing*, 39 Mo. 221; *Townsend et al. v. Drakeford*, 1 Car. & K. 22; *Goodman v. Griffith*, 1 Hurl. & N. 573; *Cooper v. Smith*, 15 East. 102; *Grant et al. v. Fletcher et al.*, 5 Barn. &

Cres. 436; *Thornton v. Kempster*, 5 Taunt. 487; *Gregson v. Ruck*, 4 Ad. & El. 744; Reed on Statute of Frauds, 349; Wood on Frauds, note to sect. 430; 1 Chitty on Contracts, 551. The Gould sale tickets and the letters November 4, *et seq.*, can not satisfy the statute of frauds. While the statute of frauds may be satisfied by different papers, they must have some reference to each other, and that reference must appear from the respective writings, and these respective writings must coincide with reference to the terms and conditions of the contract. Reed on Statute of Frauds, sects. 276, 341; Wood on Frauds, sects. 430–2; Story on Agency, sect. 243, and cases cited; *Smith v. Schell*, 82 Mo. 215; *Scarritt v. St. John's M. E. Church*, 7 Mo. App. 173; *Broecker v. Mc-Gowan*, 12 Mo. App. 207; 1 Benjamin on Sales, sect. 222. The letter of November 4, and all subsequent and prior letters between Pike and Capen, and the evidence admissible to prove a sale in the case, show the transactions in this controversy to be mere orders, and not sales by Pike for Capen. *Banks v. Chas. P. Harris Mfg. Co.*, 20 Fed. Rep. 667; *Stagg v. Compton*, 81 Ind. 130; *Lincoln v. Erie Press Co.*, 132 Mass. 129; *Smith v. Gowdy*, 8 Allen, 566; Reed on Statute of Frauds, sect. 396, note E.

. FORD & PAYNE, for the respondents: A sufficient memorandum of the various sales to satisfy the statute of frauds, may be collected from the correspondence passing between the defendant and his agent subsequent to the sales (especially the letters of November 4, 12, and 17, 1885). *Gibson v. Holland*, 1 Law Rep. [C. P.] 1; *Bailey v. Sweeting*, 9 C. B. N. S. 843; *Moore v. Mountcastle*, 61 Mo. 425; *Faunsend v. Hargrave*, 118 Mass. 335; *Lash v. Parlin*, 78 Mo. 391; *Heideman et al. v. Wolfstein*, 12 Mo. App. 366. In addition, the bought notes are sufficient memoranda. *Barclay v. Bates*, 2 Mo. App. 139, 145.

THOMPSON, J., delivered the opinion of the court.

These are several actions for damages for the non-delivery of goods alleged to have been purchased of the defendant by the plaintiffs and their assignors, through S. B. Pike & Co., his agents for the sale of his goods, at the city of St. Louis. The suits were originally commenced by attachments before a justice of the peace, and such proceedings were had in the circuit court that all of them were tried together, the same evidence being for the most part applicable to all the cases, and all of them turning upon the same facts. The trial was had in the circuit court before a judge sitting as a jury, and the plaintiffs had in all the cases a verdict and judgment. Appeals have been prosecuted to this court upon a single record in the consolidated causes.

Three objections are made to the judgment, all of which arise under the defendant's motion for an instruction in the nature of a non-suit: 1. That the evidence discloses no contract between the parties. 2. That the written memoranda appealed to as evidence of the alleged contracts are insufficient under the statute of frauds. 3. That there was no evidence tending to show that S. B. Pike & Co. had authority from the defendant to make the sales in question.

We have examined this record with much care, and have been aided in our examination by a very thorough and creditable printed statement and argument furnished us by the appellant's counsel, but we have been unable to arive at a different conclusion from that reached by the learned judge of the circuit court.

I. Upon the first point we do not think that any extended observations are required. The evidence clearly shows that the contracts, as alleged, were, in fact, made, and that their terms were clearly understood by the plaintiffs, and also by S. B. Pike & Co., through whom they were made on behalf of the defendant. If S. B. Pike & Co. had authority from the defendant to make them,

there is no ground for any discussion as to the fact of their having been made, although there was a discrepancy in their terms as made and as reported by S. B. Pike & Co. to the defendant. But if Pike & Co. had authority to make the contracts, their inaccurate report of their terms to the defendant was matter subsequent which could in no way affect the rights of the other contracting parties.

II. Upon the next point, whether the memoranda by which the contracts are evidenced are sufficient to take the case out of the statute of frauds, the propriety of the conclusion of the circuit court seems equally clear. These memoranda consist in all the cases but one of "sold notes," given to the respective purchasers, who are either these plaintiffs or their assignors, by Mr. Gould, a broker employed by S. B. Pike & Co., as their agent to effect the sales, and also of the reports of the sales made by S. B. Pike & Co. to the defendant as their principal. In respect of the sales in which these "sold notes" were given, the sold notes themselves were sufficient to take the case out of the statute of frauds. The following may be quoted as a specimen of each of them:

"ST. LOUIS, October 30, 1885.

"Sold to G. A. Eckerle & Co. for acct. of S. B. Pike & Co.

"25 cases Am. 1-4 sardines at $6.00 f. o. b. Portland. * * * Terms of sale, cash on arrival, less 3 per cent. Shipping directions, cheapest.

"WM. T. GOULD,
"Merchandise Broker."

The objection that the time of delivery is not stated in this sold note seems immaterial, because the law would annex the condition of delivery within a reasonable time under the facts of the case in conformity with the manifest understanding of the parties. In respect of the sale

which had been made by S. B. Pike & Co. to Mr. Boswell, in which no sold note had been given, it is sufficient to make this observation, which will equally apply to the other cases. That the terms of the sale were reported by S. B. Pike & Co. to the defendant; that the reply of the defendant to S. B. Pike & Co. shows that he understood the terms; that the subsequent correspondence shows that he finally repudiated the sales and endeavored to cast the loss upon S. B. Pike & Co., not because of any misunderstanding as to the terms of the sales, but because he could not get the fish. All this matter rests in the form of these sold notes and the subsequent correspondence by letter and telegram. These memoranda relating to the same subject matter taken together, as we are entitled to take them, under a well settled rule (*Heideman v. Wolfestein*, 12 Mo. App. 366; *Moore v. Mountcastle*, 61 Mo. 424), make the terms of the sale entirely clear without resort to parol evidence, and take the case out of the letter and policy of the statute of frauds. It is true, as already stated, that a slight discrepancy existed in respect of the price named in the sold notes, and that at which they were reported by S. B. Pike & Co. to the defendant in his letter of November 4. But on this point it is sufficient to say that the price, as reported, was within the express authority which Pike & Co. had received from the defendant; that the discrepancy was subsequently explained to the defendant by Pike & Co. in a letter dated November 17, which we are entitled to look to as part of the memoranda furnishing evidence of the transactions, and that it was also explained by parol evidence at the trial, which evidence our supreme court has held may be appealed to in certain cases to help out memoranda of sales of merchandise in respect of the statute of frauds. *Lash v. Parlin*, 78 Mo. 391; *Oneil v. Crain*, 67 Mo. 250. As the plaintiffs are seeking to hold the defendant to the contract as made with his agents, S. B. Pike & Co., and not

Vol. xxiii—20

as reported by S. B. Pike & Co., this objection becomes quite unsubstantial.

III.    The most serious question in the case, and the one to which we have given the most attention is whether there was substantial evidence tending to show that S. B. Pike & Co. had authority from the defendant to make the contracts in question.    It is fortunate that the question is not complicated by any element of the alleged agent being held out by the alleged principal in a given character, but depends entirely upon the interpretation to be given to a series of letters and telegrams, the genuineness of which is admitted, which, together with actual transactions, furnish the sole evidence of the understanding which subsisted between the defendant and S. B. Pike & Co.    This correspondence shows conclusively that the defendant, who was a manufacturer of sardines, having two factories at Eastport, Me., constituted S. B. Pike & Co., his agents, to sell sardines of his manufacture in the St. Louis market, to receive consignments of such sardines, to receive the invoices of the same, and to collect and transmit to the defendant the proceeds of such sales as they should make, less an agreed commission. It also shows beyond dispute that S. B. Pike & Co. were not limited by the defendant to the selling of sardines of the defendant, which had actually been received by S. B. Pike & Co., but they were authorized to sell, "to arrive," any sardines which had been or should be shipped by the defendant to them upon advice of the shipments.    So far, we understand, there is no dispute, and there is no room for any doubt upon the correspondence and actual transactions of the parties.

But the sales in controversy were neither of goods of the defendant in the actual custody of S. B. Pike & Co., nor of goods which had actually been shipped by the defendant to S. B. Pike & Co., and which were in transitu at the time sales were made by the latter, and the crucial question is whether upon a fair interpretation of the correspondence, viewed in the light of what was

actually done by the parties on authority from the defendant to S. B. Pike & Co., to sell for future delivery goods which had not been shipped, could be inferred by the circuit judge as the trier of the facts. We have come to the conclusion that it could. The sales in controversy were made on the twenty-eighth and thirtieth of October, 1885. Previous to that time, from about the first of September, Pike & Co. had been selling, as the defendant's agents or factors, his sardines both in the custody of Pike & Co. and in transitu, for cash, and remitting the cash to the defendant. The defendant had kept a stream of consignments flowing toward Pike & Co., faster at one time than Pike & Co. could work them off, and had continued to advise Pike & Co. from time to time of the scarcity of fish and of the continued advance of prices which was being made by the American Sardine Exchange, by whose prices, called "combination prices," Pike & Co. were to be governed in making sales, and Pike & Co. had been, with the defendant's approbation, selling goods to arrive. On the thirtieth of September, the defendant notified Pike & Co. that his terms of sale meant goods delivered in Portland, Me., the buyers to pay the freight. We do not consider this letter of itself an authorization to Pike & Co. to sell goods which the defendant did not have, but we regard it rather as a form, or mode of fixing the price, and as meaning that the goods would be sold for "combination prices" at St. Louis, with the addition of the freight from Portland, Me.

On the thirteenth of October the defendant telegraphed to Pike & Co.: "Sell as per No. 4, discount and commission six half,"—meaning that they were to sell at the prices named in circular number four of the American Sardine Exchange, and that the defendant would allow them a discount and commission of six and a half per cent. On October 16, Pike & Company replied by letter, acknowledging this telegram, quoting it in their letter, and saying, among other things: "We have to-

day sold A. C. L. Haase & Son, St. Louis, 100 cases oil to arrive at $6.00 at Portland, 5 per cent. off for cash. Will mail shipping directions to-morrow." Subsequently shipping instructions were mailed. This sale was not made of any sardines which were in transitu, but nevertheless the defendant made no objections to it, but shipped the goods on the twenty-third of October, in accordance with the shipping directions. This transaction, it will be perceived, took place prior to the dates of the sales in controversy, and S. B. Pike & Co. received notice of the compliance of the defendant with it prior to such dates. Moreover, the correspondence shows that the defendant did not even have the goods on hand to comply with this contract of sale at the time when notification of it was received. Now this was as distinct and unequivocal notification to the defendant as could have been made by Pike & Co. that it was their understanding that they had authority from the defendant to effect sales of his goods in St. Louis, although the goods were not in their possession or in transitu from the defendant to them. If the defendant had not intended to clothe them with this authority he should manifestly have given them a distinct notification of that fact at that time. Instead of doing this he wrote to them, on the twenty-seventh of October, a letter in which the following sentences occur: "If fish are scarce the balance of the packing season as they have been, there will not be any ¼ oil on the market this winter, and I do not see but that they will have to take mustards. If I have any for shipment will telegraph soon, you can sell to arrive before the new prices take effect. I have not received any fish this week." The new prices were to take effect, as S. B. Pike & Co. had already been notified, on the thirty-first of October, and it is not very clear why they were authorized to sell to arrive before the new prices should take effect, since it would take three days at least for the letter to reach St. Louis, and S. B. Pike & Co. would not have, at

most, more than one day in which to make any sales
before the new prices would take effect.  We do not
understand that the evidence shows the date on which
this letter was received by Pike & Co., but a mem--
orandum on the letter itself shows that it was answered
on the thirty-first of October, a day later than any of
the sales in controversy.  As there is no evidence that
the letter was received prior to any of the sales in con-
troversy, of course, it can not be read as giving to Pike &
Co. a precedent authority to sell fish which they did not
have in their possession, and which had not been shipped,
such as would cover the sales in controversy.  But, like
evidence of subsequent declarations in actions for libel
or slander, it speaks very persuasively upon the question
of the actual intent and understanding of the defendant,
especially in connection with the fact that he had but
four days before ratified the act of Pike & Co. in
selling to Haase & Son one hundred cases to arrive
which had not been shipped.

The learned counsel for the defendant endeavors to
explain away the effect of this language by asking us to
regard the word "soon" as a manifest clerical error and
to read it "so as" or "so on."  There is no principle
upon which we can thus change the meaning to the
text.  A clerical error is not manifest except the error of
omitting a point of punctuation, which error the defend-
ant's letters show him to have been in the habit of
making.  *Maladicta est interpretatio quae corrumpit
textum.*  Then what took place in respect of these par-
ticular sales was that Pike & Company seasonably noti-
fied the defendant that they had made them, requesting
shipments of fish to meet them.   At the same time they
wrote to the defendant on the twenty-ninth of October:
"Have not offered as freely as we might have done, fear-
ing you could not fill the orders, and all buyers want
immediate shipment.  Let us know how this is.  Can
we sell all we can take orders for at your limit?  Please
wire us and advise fully by letter."  On the same day

Pike & Company telegraphed this question to the defendant: "Can we sell oils freely at your limit, immediate shipment?" To which the defendant replied by telegraph: "Cannot fill orders. Fish scarce. Will ship if get any. * * *." Pike & Company responded on the same day by telegraph: "Must surely get eight hundred fifty cases to fill orders." On the same day they advised the defendant by letter, saying: "It will be a devil of a mess if you can not fill orders we have taken for oil—850 cases to date. Hearing nothing from you to the contrary and having no limit, we expected you could ship all we ordered. * * * What we have sold were for immediate shipment and parties will not release us." On the same day the defendant telegraphed and wrote Pike & Co. that he had ordered Meyer & Company to turn over to them a quantity of sardines in their hands, comprising, as stated in the letter, two hundred and thirty-four cases of one-fourth oils. On November fourth the defendant sent this telegram to Pike & Company: "Quarter for tenth seven dollars. Do not sell ahead; fish scarce." This, as shown by a letter of the same date, admonished them that after the tenth of November one-fourth oil sardines would be advanced in price to seven dollars. It was the first intimation they had received from the defendant in direct terms that they were not to "sell ahead." On the fourth of November Pike & Company wrote to the defendant explaining fully the transactions which had resulted in these sales of eight hundred and fifty cases one-fourth oil which include the sales in controversy, admonishing him that they were actual sales, not offers, for cash, and insisting upon his compliance with the contracts. They received a letter from the defendant, dated November 9, making no allusion to this letter, but saying: "Fish are as scarce as ever. We are looking for some every day, but it is hard to tell when we will get them." It was not until the twelfth of November that the defendant acknowledged the receipt of this letter of the fourth, in

which he said : " I have delayed in answering in order to see if I could get fish to fill orders ; but as fish are a failure I do not see how you can expect me to fill orders. I do not see but what you will have to notify the parties that you cannot fill orders for the above reasons. If they are reliable parties they will most assuredly see that you are not to blame or any one else for failure to do so. * * * Hoping this statement will release you from your obligation ; if not, the parties will have to wait for another season." This, the first intimation of the defendant of a purpose to repudiate the contract, took place, it will be perceived, two days after the date at which the advance of one-fourth oil sardines to seven dollars, which had been made by the American Sardine Exchange, went into effect. Several other letters passed from Pike & Company to the defendant, complaining of the defendant's failure to ship these eight hundred and fifty cases, and it was not until November 24, that the defendant wrote to them a letter distinctly repudiating their authority to make sales of the eight hundred and fifty cases.

This letter was in the following language : " Your letters in reference to the 850 cases one-fourth oil sardines sold by you is a surprise to me after what I have written to you about fish being scarce, and the Exchange circulars relating to the same thing. I do not see how you could make such a mistake and then write me and tell me that it is my fault. I did not authorize you to sell ahead and only shipped to you to sell on arrival, and shall not ship or make good any part of the 850 cases you may have sold ahead without my order."

It should be stated, in justice to the position taken by the learned counsel for the defendant, that the defendant had, in frequent letters and circulars of the American Sardine Exchange, advised Pike & Company of the continued scarcity of fish. We think, however, that this correspondence taken together and read in con-

nection with the sale to Haase & Son and its ratification by the defendant fairly authorized the trier of the facts to conclude that the defendant had given to Pike & Company a general authorization to sell his goods in St. Louis without restricting them in any respect except as to price, and that while he had advised them from time to time concerning the scarcity of fish, this was in the nature of a caution to them and not as a limitation of his instructions ; that the defendant had authorized Pike & Company to sell goods to arrive without any limitation as to whether the goods had been in fact shipped at the time of the sale or not ; that he did not revoke this authorization until after the making of the sales in question ; that he did not repudiate the sales in question as long as there was a prospect of his being able to get the fish to fill them, and not at all until thirteen days after they had been made, and until an advance in the so-called combination prices for sardines had taken effect. A business man, we think, would reach the conclusion upon this correspondence that the defendant was quite willing to take the benefit of the contracts of sales made for him by the business diligence of Pike & Company as long as the contracts could be made beneficial to him, but that when it appeared that he could not comply with them without loss he determined to unload the loss upon his agents.    The circuit court, we think, was right in not allowing him to do this.

The judgment of the circuit court will be affirmed. It is so ordered.    All the judges concur.